Chante Jawan MALLARD, Appellant,

v.

The STATE of Texas, State.

No. 2–03–279–CR.

Court of Appeals of Texas, Fort Worth.

March 3, 2005.

Robert Ford, Fort Worth, TX, for Appellant.

Tim Curry, Crim. D.A., Charles M. Mallin, Asst. Crim. D.A. and Chief of the Appellate Division, and Tanya S. Dohoney, and Richard Alpert, and Christy Jack, and Miles Brissette, Asst. Crim. D.As., Fort Worth, TX, for Appellee.

PANEL F: GARDNER, WALKER, and McCOY, JJ.

**OPINION**

SUE WALKER, Justice.

### I. INTRODUCTION

Appellant Chante Jawan Mallard appeals her convictions for tampering with evidence and for murder. Mallard pleaded guilty to tampering with evidence but pleaded not guilty to murder. The jury found her guilty of both offenses and assessed her punishment at ten years' confinement for tampering with evidence and fifty years' confinement for murder. In five points, Mallard argues that the evidence is legally and factually insufficient to sustain her conviction for murder, that the trial court erred by defining transferred intent in the jury charge, that the trial court erred by charging the jury on concurrent causation, and that the trial court erred by overruling her motion for a mistrial based on the State's alleged comment on her post-arrest silence.[1] We will affirm.

### II. FACTUAL BACKGROUND

On October 25, 2001, in preparation for an evening at Joe's Big Bamboo Club, Mallard and her friend Titilisee Fry[2] had a drink and split an ecstasy pill before smoking a marijuana joint on the way to the club. Mallard socialized, danced, smoked marijuana, and drank three or more drinks before leaving the club about 2:30 a.m. Mallard attempted to drive, but Fry could tell that Mallard was intoxicated; so, Fry drove. After they arrived at Fry's house, Mallard decided to go home. She got in her car and drove away. Mallard's statement, which was admitted into evidence, explained the events that followed.

---

1. Mallard's appellate points challenge only her murder conviction, not her conviction for tampering with evidence.

2. Both women are certified nurse's assistants.

I drove my 1997 Chevrolet Cavalier toward home and that's how I was on Frwy. 287.

I think when I was coming around the bend from Loop 820, before Village Creek, all of a sudden, bam, he was just there. I realized that it was a person I had hit and he had come through the right front windshield. I was scared and terrified and the car didn't even slow down.... He was on my car and stuck through the right front windshield. I parked my car in the garage and I put the door down.... I wanted to take him to the hospital, but I was so scared....

Fry testified that Mallard called her at approximately 3:30 a.m. and whispered, "T,[3] come pick me up." When Fry arrived at Mallard's house, Mallard came running out, jumped into the car, and started screaming for Fry to drive. Mallard used Fry's cell phone to call some friends named Terrence and Vaughn. Mallard and Fry tried to track down Terrence at his apartment and at his sister's house, but they were unsuccessful and headed back to Mallard's house.

Mallard then told Fry that she had hit "a white guy," that she was sorry, that she did not mean to do it, and that she had tried to get him off the car near the Martin/Village Creek area, but that he was too heavy. Mallard admitted that the man was alive when she drove into her garage; she heard him moan.

When Fry and Mallard returned to Mallard's house, Fry went into the garage and saw the back side of a body sticking out of the car's windshield. Fry said that she told Mallard to call 911, but Mallard never did. Later, they both left and went to Fry's house to sleep.

The next morning, Mallard borrowed Fry's car and cell phone and attempted to locate Vaughn.[4] Clete—a/k/a Vaughn— testified that Mallard met him at his grandmother's house and that they drove to Mallard's house. On the way, Mallard told him that "she messed up real bad." When they arrived, she allowed him into the garage, and he saw a man hanging through the front windshield into the passenger side floorboard of the car. Clete touched the man with a rake to see if he was alive, but the man did not move. He decided that they were not going to bury the body; instead, they were going to put it somewhere the victim's family could find him and bury him. Clete stated that he was not going to move the body by himself, so he called his cousin, Tyrone, to help. Clete and Mallard borrowed a friend's car and drove it to Mallard's house, where Clete shoveled the body into a blanket, tied up the blanket, put the blanket into the trunk of the car, and drove with Tyrone and Mallard to Cobb Park. Tyrone and Clete removed the body from the trunk, laid it on the ground, and took off the blanket. After leaving the body in the park, Clete, Tyrone, and Mallard went to a car wash and threw away the blanket.

On October 27, 2001, two older gentlemen stopped by a fire station where firefighter Todd Breedlove was getting off duty. The two men reported that there was someone who looked dead in Cobb Park. Breedlove drove to Cobb Park, saw the dead white male, and called 911. Brad Patterson with the Fort Worth Police Department arrived and completed a crime scene search. He noted that the victim's shoes and socks were missing, which indicated to Patterson that a vehicle may have run into the victim. He also noted that

---

3. Titilisee Fry goes by "T."

4. Vaughn's real name is Clete Denal Jackson.

there was no blood at the scene; thus, Patterson concluded that the victim had been moved to the park and placed where he could be found.

An autopsy revealed that the victim, Greg Biggs, suffered a near total amputation of his left leg and that he bled to death from this injury. The medical examiner initially classified the autopsy results as "pending" but changed the status to "could not be determined" on January 7, 2002 when information concerning the victim's death failed to surface. After police obtained information from one of Fry's friends and arrested Mallard in March 2002, however, the medical examiner ruled Mr. Biggs's death a homicide based on the new information.

## III.  SUFFICIENCY OF THE EVIDENCE

In her first and second points, Mallard argues that the evidence is legally and factually insufficient to sustain her conviction for felony murder.[5]  See TEX. PENAL CODE ANN. § 19.02(b)(3) (Vernon 2003). The felony murder indictment alleges,

> Chante Jawan Mallard hereinafter called Defendant, in the County of Tarrant and State aforesaid, on or about the 26th day of October 2001, did then and there intentionally or knowingly commit or attempt to commit a felony, to-wit: failure to stop and render aid as proscribed in Texas Transportation Code § 550.021 which [is] captioned "accident involving personal injury or death," and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, she committed or attempted to commit an act clearly dangerous to human life, to-wit: transported Greg Biggs to her home when he was seriously in-

jured and lodged in her car, or lodged in the windshield of her car, and she secreted him in her garage which prevented him from receiving medical care, which caused the death of Greg Biggs.

Mallard argues that the State failed to prove that she committed an act dangerous to human life; she claims that at most the State proved an omission and that an individual's failure to act cannot constitute felony murder. The State maintains that the evidence affirmatively demonstrates that Mallard did commit an act clearly dangerous to human life and that her act caused Mr. Biggs's death; the act of driving Mr. Biggs, bleeding and injured, to her house and hiding him in her garage caused his death. See TEX. PENAL CODE ANN. § 19.02(b)(3) (providing that a person commits the offense of murder if she commits a felony and in furtherance of the commission or in immediate flight from the commission of the offense, she commits an act clearly dangerous to human life that causes death).

### A.  Legal Sufficiency Standard of Review

■ In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620 (Tex. Crim.App.2004).

■ This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh

---

**5.**  Mallard does not challenge the sufficiency of the evidence to support the failure-to-stop-and-render-aid element of the felony murder charge. Consequently, we will not analyze the sufficiency of that aspect of the evidence.

the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex.Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim.App.1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000). We must resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim.App.2000).

## B. Factual Sufficiency Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. *See Zuniga v. State*, 144 S.W.3d 477, 481 (Tex. Crim.App.2004). The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Id.* at 484. There are two ways evidence may be factually insufficient: (1) the evidence supporting the verdict or judgment, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment, weighing all the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. *Id.* at 484–85. "This standard acknowledges that evidence of guilt can 'preponderate' in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable

doubt." *Id.* at 485. In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt. *Id.* In performing a factual sufficiency review, we are to give deference to the fact finder's determinations, including determinations involving the credibility and demeanor of witnesses. *Id.* at 481; *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997). We may not substitute our judgment for that of the fact finder's. *Zuniga*, 144 S.W.3d at 482.

A proper factual sufficiency review requires an examination of all the evidence. *Id.* at 484, 486–87. An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

## C. Evidence Concerning Mallard's Commission of an Act Clearly Dangerous to Human Life

Dr. Nizam Peerwani, Tarrant County's chief medical examiner, testified as follows:

Q. [PROSECUTOR:] Do you have an opinion as to whether or not the act of continuing to drive that motor vehicle with Mr. Biggs lodged in the windshield would have aggravated his condition?

A. [DR. PEERWANI:] Yes, sir, I do.

Q. And what is that opinion?

A. It certainly would have aggravated the condition.

Q. And why is that? How can you say that?

A. Well, he's not anchored well. Motions of the car—acceleration, turning around corners, stopping—would shift the body and would cause more

injury to his unsupported near amputated lower extremity and perhaps increase his vascular trauma and injury.

Q. Do you have an opinion as to whether or not the act of trying to pull him in or out of that windshield of that car within minutes of striking him would have aggravated him?

A. Yes, sir.

Q. And what is that opinion?

A. That would also certainly cause similar types of increase in damage to the tissues.

Q. Now, the very serious injury that you showed them a photograph of, of the left leg, are you able to tell whether any of that vascular tearing happened after impact or not? In other words, once the bone and skin are cut, can improper moving of the leg or the body cause further tearing of those veins and arteries?

A. Yes, certainly. It's distinctly possible, sir.

Q. Do you have an opinion as to whether or not the act of driving the car in which Mr. Biggs was lodged and into a garage and closing the door of that garage was an act clearly dangerous to his life?

A. Yes, sir, in the sense that there was no help asked, certainly.

Q. Okay. In fact, do you think his odds of receiving help would have been better if he had been left along the roadway?

. . . .

A. Certainly, in an enclosed garage, nobody is going to observe an injured person. Open space, there's more chance somebody might observe a person and ask for help.

Q. Or at least some chance; is that correct?

A. Yes, sir.

Q. Do you have an opinion whether or not the act of driving Mr. Biggs to a garage while he was alive and leaving him in the garage and not giving him medical attention contributed to his cause of death?

A. Yes, sir.

Q. And what is your opinion?

A. It certainly did, sir.

. . . .

Q. And the cause of death ultimately that you found in this case?

A. The cause of death medically was described as multiple traumatic injuries sustained in the auto/pedestrian collision.

Q. And the manner of death?

A. The ultimate amended manner of death was filed as homicide, sir.

Additionally, the evidence adduced at trial revealed that the initial impact from the collision did not kill Mr. Biggs or cause injuries that would inevitably cause his death.[6] Although the defense's expert, Dr. Vincent Di Maio, gave his opinion that Mr. Biggs was unconscious when his body broke through the windshield, Dr. Di Maio agreed that Mr. Biggs could have survived up to two hours lodged in the windshield and that he died as a result of blood loss from the failure to receive medical attention. Several people testified that Mallard told them that Mr. Biggs lived through the initial impact and was able to moan; blood spatter evidence illustrated that Mr. Biggs breathed and moved after he was lodged partially inside the vehicle. Finally, Dr. Ray Swienton, the interim chairman of

6. The State proved that Mr. Biggs was not suffering from any life-threatening illness at the time of his death.

emergency medicine at John Peter Smith Hospital (JPS), testified that, to date, no patient presenting to the JPS emergency room with injuries similar to Mr. Biggs's injuries has died. Consequently, Mallard's actions [7]—driving to her house with Mr. Biggs lodged in the windshield of her vehicle, parking her vehicle in her garage, and shutting the garage door—ensured Mr. Biggs's death by foreclosing any possibility that he would receive medical treatment.

Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *see Loredo v. State*, 130 S.W.3d 275, 280 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd) (holding evidence legally sufficient to support conviction for felony murder). Furthermore, viewing all the evidence in a neutral light, favoring neither party, we also conclude that the evidence supporting the verdict, taken alone, is not too weak to support the finding of guilt beyond a reasonable doubt and that the contrary evidence is not so strong that guilt cannot be proven beyond a reasonable doubt. *Dotson v. State*, 146 S.W.3d 285, 295 (Tex.App.-Fort Worth 2004, pet. ref'd); *see Drew v. State*, 76 S.W.3d 436, 447 (Tex.App.-Houston [14th Dist.], pet. ref'd) (holding evidence factually sufficient to support conviction for felony murder), *cert. denied*, 537 U.S. 1047, 123 S.Ct. 601, 154 L.Ed.2d 520 (2002). Accordingly, we hold that the evidence is both legally and factually sufficient to support Mallard's conviction for felony murder. We overrule Mallard's first and second points.

## IV. COURT'S CHARGE TO THE JURY

In her third and fourth points, Mallard contends that the trial court erred by overruling her objection to the inclusion of the definition of transferred intent in the charge and by charging the jury on concurrent causation. The State argues that the trial court properly charged the jury and that, alternatively, any harm was not egregious.

### A. Standard of Review

■ Appellate review of alleged error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex.Crim.App.1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32.

■ Error in the charge, if timely objected to in the trial court, requires reversal if the error was "calculated to injure [the] rights of the defendant," which means no more than that there must be *some* harm to the accused from the error. TEX.CODE CRIM. PROC. ANN. ART. 36.19 (Vernon 1981); *see also Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1985) (op. on reh'g). In other words, a properly preserved error will call for reversal as long as the error is not harmless. *Almanza*, 686 S.W.2d at 171. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.; see also Ovalle*

---

**7.** Mallard's actions related to the unchallenged failure-to-stop-and-render-aid felony murder element included her failure to stop and call for help at one of the nine pay phones between the accident site and her home and her failure to drive 6.1 miles to JPS or 0.7 miles to the nearest fire station to obtain medical assistance.

*v. State*, 13 S.W.3d 774, 786 (Tex.Crim. App.2000).

█ If error exists in the charge but no objection was lodged, we must decide whether the error was so egregious and created such harm that the appellant did not have a fair and impartial trial—in short, that "egregious harm" has occurred. *Almanza*, 686 S.W.2d at 171; *see* TEX.CODE CRIM. PROC. ANN. ART. 36.19; *Hutch v. State*, 922 S.W.2d 166, 171 (Tex.Crim.App.1996). Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex.Crim.App.2002); *Hutch*, 922 S.W.2d at 171.

## B. Transferred Intent

█ The jury charge included the following abstract definition of transferred intent: "A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what she desired, contemplated, or risked is that a different offense was committed." The charge did not include an application paragraph incorporating the transferred intent definition.

During the charge conference, Mallard objected to the inclusion of the transferred intent definition, arguing that the abstract definition of transferred intent would create confusion. On appeal, Mallard likewise argues that the trial court's inclusion of this definition undermined the jury's consideration of the lesser included offense of failure to stop and render aid.

The record does not demonstrate that the charge's abstract definition of transferred intent caused the confusion that Mallard alleges. During closing arguments, the prosecutor explained to the jurors that they could reach the lesser in-

cluded offense only if they unanimously found Mallard not guilty of felony murder. The plain language of the charge likewise instructed the jury to proceed to consider the lesser included offense of failure to stop and render aid only if they acquitted Mallard of murder. We assume that the jury followed the given instructions, and there is no showing that the jury did not follow them. *See Luquis v. State*, 72 S.W.3d 355, 366–68 (Tex.Crim.App.2002). Therefore, the trial court did not err by overruling Mallard's objection to the submission of the abstract definition of transferred intent. *See Lewis v. State*, 815 S.W.2d 560, 562 (Tex.Crim.App.1991) (holding no error occurred by overruling objection and giving abstract instruction on transferred intent when the issue of transferred intent was not incorporated into the application paragraph), *cert. denied*, 503 U.S. 920, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1992). We overrule Mallard's third point.

## C. Concurrent Causation

█ The jury charge in question included the following abstract definition of concurrent causation: "A person is criminally responsible if the result would not have occurred but for her act, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the act of the Defendant clearly insufficient." The charge did not include an application paragraph incorporating the concurrent causation definition. Neither party objected. On appeal, Mallard argues that no evidence exists to support a charge on concurrent causation.

We need not determine whether the trial court erred by including the abstract definition of concurrent causation [8] be-

8. The State provides a well-reasoned analysis of why inclusion of the concurrent causation

definition in the charge was not erroneous. We decline, however, to undertake an error

cause, in any event, the inclusion of the concurrent causation instruction did not egregiously harm Mallard. Here, the abstract paragraph on causation did not apply that theory to the facts of the instant case. Neither did the application paragraph incorporate the concept of concurrent causation. The absence of an application paragraph incorporating the concept of concurrent causation means that the jury was not authorized to convict on a theory applying concurrent causation. *See Hughes v. State,* 897 S.W.2d 285, 297 (Tex. Crim.App.1994) (holding no harm occurred by giving superfluous abstract instruction on causation when the issue of causation was not incorporated into the application paragraph and jury was not authorized to convict on that theory of causation), *cert. denied,* 514 U.S. 1112, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995); *accord Garrett v. State,* 642 S.W.2d 779, 781 (Tex.Crim.App. 1982) (holding that although a proper charge should correctly apply transferred intent to the facts, the failure to do so does not constitute a fundamental defect requiring reversal). Accordingly, Mallard was not egregiously harmed by the inclusion of an abstract definition of concurrent causation. *See Hughes,* 897 S.W.2d at 297. We overrule Mallard's fourth point.

### V. MOTION FOR MISTRIAL

■ In her fifth point, Mallard asserts that the trial court erred by overruling her request for a mistrial after the State allegedly commented on her post-arrest silence during the punishment phase of trial. The State responds that the objection was untimely. Mallard testified during the punishment phase. During the State's cross-examination, the following exchange took place:

[PROSECUTOR:] Ms. Mallard, I'm going to ask you some questions about your testimony. We haven't talked before, right?

[MALLARD:] No, sir.

[PROSECUTOR:] May I approach, Your Honor?

THE COURT: You may.

[DEFENSE COUNSEL:] Your Honor—objection, Your Honor. May we approach?

(At the bench, on the record:)

[DEFENSE COUNSEL:] That is a comment on the failure—that is a comment on her ability to assert the Fifth Amendment. That's absolutely error. I do not want to call the jury's attention to it and focus on it, but I want a mistrial, and I want it right now.

THE COURT: Denied.

[DEFENSE COUNSEL:] Your Honor, I want for the record . . . exactly what he said. He said, "You and I have not talked before," and that is clearly a comment on her assertion of the Fifth Amendment right. Clearly.

[PROSECUTOR:] Your Honor, we just ask for a[n] instruction to disregard if he believes that's what I was referring to. That wasn't my intent.

(Open court:)

THE COURT: All right. Jury will disregard the last question.

You may continue.

[DEFENSE COUNSEL:] Your Honor, I renew my request for a mistrial.

THE COURT: Denied.

---

analysis in this instance because, as discussed above, no egregious harm resulted from the unobjected-to alleged error. *Accord Tong v. State,* 25 S.W.3d 707, 718 (Tex.Crim.App. 2000) (op. on reh'g) (stating that "this Court has occasionally analyzed voir dire issues solely on the basis of harm, skipping the preliminary question of error"), *cert. denied,* 532 U.S. 1053, 121 S.Ct. 2196, 149 L.Ed.2d 1027 (2001).

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. TEX.R.APP. P. 33.1(a)(1); *Mosley v. State*, 983 S.W.2d 249, 265 (Tex. Crim.App.1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. TEX. R.APP. P. 33.1(a)(2); *Mendez v. State*, 138 S.W.3d 334, 341 (Tex.Crim.App.2004).

Here, Mallard responded to the prosecutor's initial question, the prosecutor asked for permission to approach Mallard to show her an exhibit, the trial court granted the prosecutor permission to approach Mallard, and then defense counsel objected to the question. Consequently, the objection was untimely. *See Lagrone v. State*, 942 S.W.2d 602, 618 (Tex.Crim.App.) (stating that if defendant fails to object until after an objectionable question has been asked and answered, his objection is untimely), *cert. denied*, 522 U.S. 917, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997). Because the objection was untimely, Mallard forfeited this point. *See Mendez*, 138 S.W.3d at 342 (holding that appellant forfeited his right to present claim on appeal by failing to present timely objection to the trial court). Therefore, we overrule Mallard's fifth point.

## VI. CONCLUSION

Having overruled each of Mallard's points, we affirm the trial court's judgment.